[Sac. No. 2094.    Department Two.—October 3, 1914.]

CHARLES C. MORRIS, Respondent, v. SOUTHERN PACIFIC COMPANY et al., Defendants; SOUTHERN PACIFIC COMPANY, Appellant.

NEGLIGENCE — RAILROAD — INJURY TO PASSENGER — EXONERATION OF AGENTS IN CHARGE OF TRAIN—WANT OF NEGLIGENCE IN OPERATION.—In an action by a passenger against a railroad company and the conductor and engineer of the train, to recover damages for personal injuries caused by the derailment of the train, as the result of a washout, a verdict exonerating the conductor and engineer is conclusive upon the proposition that there was no negligence in the operation of the train.

ID.—DERAILMENT OF TRAIN—NEGLIGENCE IN MAINTAINING ROADBED—UNDERMINING OF TRACK BY STORMWATERS—APPARENT SAFE CONDITION OF TRACK.—A railroad company is not liable to a passenger for personal injuries resulting from the derailment of the train on which he was traveling, on the theory that it was negligent in not maintaining its roadbed in a safe condition, where the accident occurred at a place previously believed to be safe, and was caused by the undermining of the track by storm waters of unprecedented severity, in a manner which did not affect the surface conditions, so that the track seemed to be in sound condition.

ID.—CONDITIONS NOT REASONABLY TO BE ANTICIPATED.—A carrier of passengers is not obliged to proceed to provide against casualties which have not been known to occur before and which may not reasonably be anticipated. That which never happened before and which in its character is such as not naturally to occur to prudent men to guard against its happening at all, cannot, when, in the course of years, it does happen, furnish good grounds for a charge of negligence in not forseeing its happening and guarding against that remote contingency.

APPEAL from a judgment of the Superior Court of Merced County and from an order refusing a new trial. L. W. Fulkerth, Judge presiding.

The facts are stated in the opinion of the court.

L. L. Cory, for Appellant.

F. G. Ostrander, and J. B. Jennings, for Respondent.

HENSHAW, J.—Plaintiff brought this action to recover for injuries which he suffered while a passenger upon defendant's train. The cause was tried before a jury which returned a verdict in the sum of $6,814.50 against the defendant Southern Pacific Company. From that judgment and from an order denying its motion for a new trial the railroad company appeals.

The injuries resulted from the derailment of the train, occasioned by storm waters which undermined the track. The accident occurred about 11 P. M. of the twentieth day of January, 1911, in Merced County. There had been rains of unprecedented heaviness in that part of the country and the storm and flood waters were being carried down new and old river channels to defendant's tracks. The company had been warned of the possibility of danger to its tracks from these flood waters at a point a mile and a half north of its station at Minturn where there was an old slough of the Chowchilla River. This slough had been known in the past to carry part of the storm waters of the river. The foreman of a large vineyard near Minturn had notified his superintendent that a very heavy freshet of storm waters was approaching the railroad tracks. The superintendent in turn notified the defendant's agent at Minturn. This agent promptly carried the information to the proper officials and immediate steps were taken to watch and protect the tracks at the old slough a mile and a half north of Minturn, where alone any danger was expected. We may pause here to give the substance of the testimony of the witnesses called on behalf of the plaintiff. W. A. Nourse was the foreman of the Sierra Vineyard and conveyed the information of the threatened danger to D. V. Harris, the superintendent of the vineyard. Nourse testified that about 3 o'clock in the afternoon of the night of the accident he telephoned to Harris "that the Chowchilla was very high and the water was coming down toward the Southern Pacific tracks and might cause some damage or washout. When I gave the notice and said look out for the

track, I meant the track where the old slough came through. I did not give any notice that the water was coming up one mile northwest of that point. I have been foreman of this company for about eight years, and during all that time I have never known the water to be up to this particular point where the accident occurred. Sometimes I have seen heavy freshets when the water came down the old slough and when it overflowed, but the water never got up to this particular point where the wreck occurred during any of those times. The notice I gave the agent referred to the track at this old channel. Where the railroad crossed the old slough there was a trestle; never very much water came down the old slough, not since I have been there. It was down that far in 1906. That is the only time that I have ever known it to approach the embankment at the old slough. Didn't then cause a wash-out. During all the time I have been there there was water enough in this one time to run back toward the Chowchilla. I have never known it to go up as far as the point where the accident occurred." Mr. Harris testified: "In extremely high water the Chowchilla does overflow. On the day of the accident I sent a warning to the agent of the railroad with reference to high water. I asked my foreman to telephone the agent at Minturn that there was very high water. There is an old river channel paralleling the present channel, and in very high water the water overflows into that. This was nearly one mile south of the point of derailment. I received a telephone message from the Sharon estate that the river was very high. They said it was a cloudburst. All the time that I have been there I have never seen such a flood. This old channel is about one-eighth of a mile from the river, nearer San Francisco. The wreck occurred nearly a mile further west from the old channel. I was afraid the freshet would come down the old channel, and it was there I feared the damage would occur. I did not anticipate or expect that the water would go one mile up the track and make a washout. I had never seen water there before. There were no embankments there to control the water up to this point where the accident occurred. Notwithstanding this tremendous freshet coming down, I did not believe it possible for any water to get as far north as where the accident occurred. I have seen water in the old channel, but I do not believe it ever reached the railroad bridge. It is very sandy and the water sinks

very fast. I never saw the water reach the railroad bridge before in the old channel. I have been there when there had been other freshets. In the heavy freshets before, there never was enough water come down to imperil the railroad track at that point. There have been pretty high freshets before, so the water came down the old channel, but I never, up to this time, saw enough water come down to reach the railroad embankment. At this time, I understand, it not only reached the railroad embankment, but went one mile up the railroad track and caused this washout." The foregoing testimony was all the testimony offered by plaintiff. The defendant's testimony corroborated this and stands uncontradicted. Thus, Patrick Ferguson testified that he had been in the employ of the defendant company for thirty-seven years; that he had been roadmaster of the particular district where the accident occurred for the last eight years. His evidence is as follows: "I have never known of any freshet water having been at the point of the accident before. The embankment at that place was about 4 or 5 feet high. Before the accident the track was in first class condition. Late in the afternoon of that day, I received a telegram from the superintendent's office. I wired instructions to the section foreman. The telegram is as follows: 'Water reported running toward track about mile and half west toward Minturn. Go there, examine and protect as soon as possible.' (In railroad parlance towards San Francisco is west and away from San Francisco is east.) The accident did not occur at that point, but a mile and a half west of that point nearer Merced. The bridge over the Chowchilla River and the dry gulley is about a mile and a quarter from Minturn. During all the time I have been there I have never seen water in the Chowchilla River which would cause any uneasiness or any trouble. It is very seldom that the water ever covered the territory between the piers. All waterway was confined to a small portion of the channel. There were no fears from the Chowchilla River as far as I know." Witnesses W. G. Hayes and C. C. Kloson testified that they had known the place where the washout and accident occurred since the year 1880; that they had never known of any flood or storm waters being there and that never before had there been any freshet or flood or any other water saving that from the ordinary rainfall upon the land.

The conductor and the engineer of the train which suffered derailment were made parties defendant. Their testimony is that they received orders that flood waters were to be apprehended about a mile and a half north of Minturn, that they were to proceed slowly and cautiously and not attempt to make up any time which was lost. They did so proceed. The headlight was an acetylene light which made the track clearly visible for a hundred yards. The accident occurred, not at the channel of the old slough a mile and a half north of Minturn, but quite unexpectedly at a point about three miles north of Minturn. The engineer testifies: "Before we got there, I looked along the line and everything looked physically intact. There was nothing in the track just at the point of the accident, as I approached it, that would warn me at all. The track looked fine. It never looked better at any time. The gravel was intact and it looked all right until the engine trucks hit it. The little wheels ahead of the drivers, they must have crushed it in, and when the drivers came down they went right in the hole. The engine truck had scraped the gravel down in. It threw me forward, and she plowed right through and by that time the engine became uncoupled from the train. The engine tender still stayed on the track. I have never known any water at the particular point where the accident occurred. The point I was cautioned about was a mile and a half west of Minturn, which is a mile and a half south of the point of the accident, which was three miles from Minturn." The conductor declares: "I looked to see what was the cause of the derailment. It was the water. The engine stayed on the track, it was across the washout from the train. The engine could not have stayed on the track if the washout had been there when the engine went over it."

The jury by its verdict exonerated the conductor and engineer, which is conclusive upon the proposition that there was no negligence in the operation of the train. Therefore the sole negligence in the case is that charged against the corporation in not maintaining its roadbed in a safe condition.

The facts in this case, as has been said, are not in conflict. They not only fail to show the slightest negligence upon behalf of the appellant but they demonstrate that appellant exercised to the utmost the high degree of care demanded

of it by law. (Civ. Code, sec. 2100.) Never in the history of the road had there been danger from flood waters at the place of the accident. This particular flood was of unprecedented severity. At a place upon the roadbed believed by everybody to be safe, the waters undermined the track without in the least affecting the surface conditions so that the track seemed to be in sound condition. It was a trap, the existence of which was only known as the engine passed over it. Says the supreme court of Missouri (*Helt* v. *Southwest Missouri Elec. Ry. Co.*, 84 Mo. App. 443): "A carrier of passengers is not obliged to proceed to provide against casualties which have not been known to occur before and which may not reasonably be anticipated. . . . That which never happened before and which in its character is such as not naturally to occur to prudent men to guard against its happening at all, cannot, when, in the course of years, it does happen, furnish good grounds for charge of negligence in not foreseeing its happening and guarding against that remote contingency." This language has been explicitly approved by this court in *Cary* v. *Los Angeles Ry. Co.*, 157 Cal. 599, [21 Ann. Cas. 1329, 27 L. R. A. (N. S.) 764, 108 Pac. 682], and again in *Teale* v. *Southern Pacific Company*, 20 Cal. App. 570, [129 Pac. 949], and it is in accord with the rule of decision in all jurisdictions. In the following cases the accidents were occasioned, as here, by storm waters: *Libby* v. *Maine Cent. R. Co.*, 65 Me. 34, [20 L. R. A. 812, 26 Atl. 943]; *International etc. R. R. Co.* v. *Halloren*, 53 Tex. 46, [37 Am. Rep. 744]; *Central Tr. Co.* v. *Wabash Ry.*, 87 Fed. 441; *Ellet* v. *St. Louis etc. Ry. Co.*, 76 Mo. 518; *Norfolk etc. Co.* v. *Marshall*, 90 Va. 836, [20 S. E. 823]; *Baltimore & Ohio R. Co.* v. *Sulphur Spring Ind. School Dist.*, 96 Pa. St. 65, [42 Am. Rep. 529]; *Gulf C. & S. F. R. Co.* v. *Pomeroy*, 67 Tex. 498, [3 S. W. 722]; *McPherson* v. *St. Louis etc. Co.*, 97 Mo. 253, [10 S. W. 846].

The trial court fairly instructed the jury upon this proposition. Under the instructions given and under the evidence set forth the jury could with propriety have rendered but one verdict, and that of exoneration.

The judgment is therefore reversed and the cause remanded.

Lorigan, J., and Melvin, J., concurred.

Hearing in Bank denied.